**UNITED STATES of America,**

v.

James MCDONALD, Michael Henderson, Clarence Earl Williams, Jimmy Wingate, Anthony Van Scott, Toran Scott, Ralph Worthington, Anthony Cherry, Darryl Williams, Kelly Brown, Harry Settles, Defendants.

**No. CR.02–479 RWR/JMF.**

United States District Court, District of Columbia.

Dec. 16, 2002.

Christopher Michael Davis, Mary Elizabeth Davis, Davis & Davis, Washington, DC, for Michael Henderson.

Joseph Edmund Beshouri, Washington, DC, for Clarence Earl Williams.

Barry Maurice Johnson, Largo, MD, for Jimmy Wingate.

Elita C. Amato, Washington, DC, Pleasant S. Brodnax, III, Washington, DC, for Anthony Van Scott.

Michael Alan Olshonsky, Washington, DC, for Torran Scott.

Clark Utterback Fleckinger, II, Law Offices of Clark U. Fleckinger, II, Rockville, MD, for Ralph Worthington.

Stephen F. Brennwald, Brennwald & Robertson, LLP, Washington, DC, for Anthony Cherry.

Nathan I. Silver, II, Bethesda, MD, for Melvin Cherry.

Michael Joseph McCarthy, McCarthy & Sullivan, Bowie, MD, for Darryl Williams.

Allen Howard Orenberg, Dilworth Paxson, P.L.L.C., Washington, DC, Jensen Egerton Barber, Law Offices of J.E. Barber, P.C., Washington, DC, for Kelly Brown.

James W. Rudasill, Jr., Washington, DC, for Harry Settles.

M. Jeffrey Beatrice, Adam Lawrence Rosman, U.S. Attorney's Office, Washington, DC, for U.S.

## DETENTION MEMORANDUM

FACCIOLA, United States Magistrate Judge.

This matter comes before me upon the application of the United States that the defendants Harry Settles, Ralph Worthington, Darryl Williams and Kelly Brown be detained pending trial.[1] After a hearing, the government's motion was granted, and this memorandum is submitted to comply with the statutory obligation that "the judicial officer shall—include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1).

## FINDINGS OF FACT

The evidence before the Grand Jury in this case was based on hundreds of wiretapped conversations and on the testimony of a government cooperator. The cooperator was highly placed in a drug dealing conspiracy. According to that cooperator, at the apex of the drug distributing scheme was an as yet unapprehended con-

---

1. I denied the government's motion as to Melvin Cherry and Jimmy Wingate and instead set conditions upon their release. To my knowledge, the remaining defendants are at large.

spirator named James McDonald. The cooperator was at the level immediately below McDonald, and indicated that the defendant Michael Henderson was at the same level as the cooperator. Beneath them were their purchasers, Ralph Worthington, Darryl Williams, Clarence Williams, Harry Settles, and Anthony Cherry.

The government charges that the purchasers were substantial purchasers of wholesale amounts who, in turn, sold to street retailers. The actual amounts sold are functions of the evidence against each defendant but generally the government charges that the wholesale amounts were substantial and clearly not intended for personal use by the purchaser. The government estimates that over the duration of the conspiracy the conspirators bought and sold 150 kilograms of crack and 110 kilograms of powder cocaine.

In the two attached charts, I have outlined the indictment to makes its allegations more comprehensible. In the first chart, I list the substantive offenses charged against the various defendants and in the second chart I list overt acts charged against the various defendants. My discussion of the evidence that follows is based on those charts and the representations made by government counsel at the detention hearings.

*Harry Settles* The Grand Jury has charged that Settles sold crack on two occasions and possessed it with the intent to distribute it on a third. The government indicated that the highly placed cooperator ("the cooperator") dealt with Settles directly. The cooperator will testify that Settles regularly obtained from the "McDonald level" of the conspiracy one eighth of a kilogram for re-distribution to Settles' retailers and that Settles' did so for a lengthy period.

*Ralph Worthington* The indictment charges Ralph Worthington with 5 sales of crack and all of them were to government agents. In the intercepted conversations, Worthington orders crack from the cooperator, discusses a debt owed to other conspirators and a raid on the home of a conspirator. The latter, the government charges, indicates significantly that the conspirators were not operating as individuals but were aware of each other activities and problems. Finally, in a recently intercepted call, on December 3, 2002, Worthington discussed another sale of crack but consummation of that sale was prevented by the arrest of the conspirators.

*Darryl Williams* The government insists that the information before the Grand Jury indicates that Williams was a higher level lieutenant who purchased, for re-distribution, cocaine and crack in one half ounce and kilogram amounts. The cooperator was the source for Williams and will testify that Williams was a regular purchaser from Henderson and the cooperation. Hence, according to this evidence, Williams would be at the third tier of the conspiracy, just below the persons (Henderson and the cooperator) who bought from McDonald. There are no substantive counts charged against Williams in the indictment but the government will offer four intercepted calls in a relatively brief time to insist that, as the cooperator has indicated, Williams was regularly engaged in buying drugs.

*Kelly Brown* The government insists that Brown is at the wholesale level just below Henderson and the cooperator and that the evidence will show that during 2001, Brown received, once a month, from 62 grams to an eighth of a kilogram to be resold to purchasers. The government claims that it will establish its case against Brown from the cooperator and two "civil-

ian witnesses." The government also claims that it will also rely on intercepted conversations in which:

1. Brown called his supplier to buy drugs and arrange a meeting; in the call, there was an indication that Brown owed his supplier $1,000.

2. Brown called his supplier again to arrange another drug transaction. During this call, Worthington joined the call and the participants discussed the execution of a search warrant at a purchaser's home. According to the government, this once again indicates how the conspirators kept each other informed about activities involving each other's illegal activities.

3. Brown made another call to his supplier to arrange for a drug purchase but called it off because he feared the police were aware of his activities.

4. Brown then called his supplier to discuss a purchase to be consummated at the Malcolm X school.

The government also points to calls containing discussions between Brown and his supplier in which there was a discussion of Brown's being consigned drugs on credit, i.e., being "fronted," which, according to the government, shows a continuing business relationship.

### The Statutory Standard

Defendants who are charged with an offense for which a term of imprisonment of 10 years is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951 *et seq.*), or the Maritime Drug Law Enforcement Act (46 U.S.C. §§ 1901 *et seq.*) are eligible for pretrial detention. 18 U.S.C. § 3142(f)(1)(C). If there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of 10 years or more is prescribed in those three statutes, it is presumed that there is no condition or combination of conditions which will reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C § 3142(e). In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer is to consider:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

2. The weight of the evidence;

3. The history and characteristics of the person, including

   a. His character, physical and mental condition, family ties, employment, financial resources, length of residence in the community and community ties;

   b. Past conduct, history relating to drug or alcohol abuse;

   c. Criminal history;

   d. Record concerning appearance at court proceedings;

   e. Whether, at the time of the current offense or arrest, the person was on probation, parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State or local law;

4. The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### The Purpose of the Bail Reform Act

The central purpose of the Bail Reform Act of 1984 was to permit the explicit consideration of the defendant's danger-

ousness by the judicial officer setting conditions of release. S.Rep. No. 98–225, *passim.* Hence, the defendant's dangerousness is to be explicitly considered, and most significantly for this case, whether the case involves a narcotic drug. While the fact that the case involves a narcotic drug might bear on whether the defendant presents a risk of flight, that the case involves a narcotic drug bears directly on the defendant's dangerousness. For the purposes of the Bail Reform Act, "dangerous" does not mean violent:

> The Committee [on the Judiciary] intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence. This principle was recently endorsed in *United States v. Provenzano and Andretta* [605 F.2d 85] (1979) in which it was held that the concept of "danger" as used in current 18 U.S.C. 3148 extended to nonphysical harms such as corrupting a union. The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."

*Id.,* reprinted in John Weinberg, *Federal Bail and Detention Handbook* at II–12–13 ( 1998).

Additionally, in the same report, there was an explicit finding that drug traffickers were particularly recidivistic:

> It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

S.Rep. No. 98–225, at Weinberg, *supra,* at II–20.

Hence, under the Bail Reform Act, drug traffickers are presumptively to be detained because the explicit consideration of their recidivism, a consideration the Bail Reform Act permits, indicates their dangerousness, i.e., the likelihood of their resuming their drug trafficking, if released.

Prior to the Bail Reform Act of 1984, when the only appropriate consideration was whether the defendant appeared when required, the factors to be considered bore on that criterion. When the law was amended in 1984, factors to be considered had to be added to reflect the judicial obligation to consider dangerousness explicitly:

> Most of the factors set out in subsection (g) are drawn from the existing Bail Reform Act and include such matters as the nature and circumstances of the offense charged, the weight of the evidence against the accused, and the history and characteristics of the accused, including his character, physical, and mental conditions, family ties, employment, length of residence in the community, community ties, criminal history, and record concerning appearance at court proceedings. The Committee has decided to expand upon this list and to indicate to a court other factors that it should consider. These additional factors for the most part go to the issue of community safety, an issue which may not be considered in the pretrial release decision under the [then existing] Bail Reform Act. The added factors include not only a general consideration of the nature and seriousness of the danger posed by the person's release but also the more specific factors of whether the offense charges is a crime of violence or involves a narcotic drug, whether the defendant has a history of drug or alco-

hol abuse, and whether he was on pretrial release, probation, parole or another form of conditional release at the time of the instant offense.

S.Rep. No. 98–225, at Weinberg, *supra,* at II–23.

Thus, the factors, in what is now 18 U.S.C. § 3142(g), that were carried forward from the earlier Bail Reform Act and that naturally bear on whether the defendant will appear (family ties, employment, financial resources, length or residence in the community) have little or nothing to do with whether the defendant represents a danger to the community if released. While it is possible that consideration of one of those factors (criminal history) might lead to the conclusion that there is little risk that the defendant might or might not be dangerous, consideration of other factors at best bears obliquely on the defendant's dangerousness. Indeed, and ironically, if the government prevails in this case, it will establish the irrelevance of family ties, employment, financial resources, length or residence in the community to dangerousness. Defendants point to their long time residence in the community, their employment, and family ties. But, if they are in fact guilty, then the government will have established that supposedly hard working family men can engage in drug dealing at the wholesale level on a weekly or monthly basis over several years and endanger the community on a long term and consistent basis.

This is not to say that every one who engages in drug dealing on any level is *ipso facto* dangerous for then the presumption in favor of detention would become irrefutable. It is to say that when a Grand Jury finds that defendants have engaged in drug dealing that is occurring on at least a weekly or hourly basis and involves wholesale amounts of drugs the only legitimate focus has to be on the danger the defendants present of resuming their drug dealing if released. To say they will not because they are employed and have substantial roots in the community is *non sequitur.* The Grand Jury has found that they engaged in extensive drug dealing despite those roots, thereby establishing the irrelevance of those roots.

Note how some of the evidence in this case supports the correctness of the presumption Congress created in favor of the proposition that defendants such as these will continue drug dealing despite their arrests. There is evidence that one of the conspirators was aware of the execution of search warrant at the residence of another conspirator. Yet, his drug dealing continued. To say that these defendants will now stop because they have been arrested and had the fear of the courts put in them is, at best, arrant speculation. More to the point, the United States' experience since the Bail Reform Act of 1984 was enacted confirms the accuracy of the Congressional perception that recidivism was, unfortunately, the norm in the American criminal justice system. The statistics are horrifying.[2] While I am not certain that similar statistics pertaining to drug offenders are available, my daily experience as a magistrate judge convinces me beyond all doubt that drug offenders are extremely recidivistic. In the teeth of that reality, to find that these defendants are unlikely to resume their drug dealing, despite the Congressional presumption, the incontrovertible statistical evidence, and the daily experience of the American court would be utterly irresponsible.

---

**2.** *See* http://www.ojp.usdoj.gov/bjs/crimoff.htm#recidivism (67% of all offenders released from State prisons rearrested within 3 years for serious crime and substantial percentage of those are re-convicted).

It is in this sense that I must say that there is really is nothing before me that rebuts the presumption of dangerousness. Indeed, if one took the defendants' best case and insist that the likelihood of their ceasing to deal drugs is equal to the likelihood that they would resume their drug dealing, the result would be the same. It is the defendants' obligation to rebut the presumption and they have not done so.

A final word about the weight of the evidence. Defendants have emphasized that if one looks at the indictment, focusing solely on the overt acts, their participation is discreet and minimal. The government protests that it is not obliged to list all of its evidence in its indictment and its evidence, particularly the testimony of the cooperating conspirator, will establish an involvement in the conspiracy's drug dealing that is long, deep and wide. I have no choice at this point but to credit the government's representation; I can't try a conspiracy case in a detention hearing. The government's representation is most significant. In that context, an atomistic view which focuses on only what each defendant did to show his participation in the commission of one of the individual crimes charged threatens to lose sight of the forest for the trees. That, at this point, a particular defendant's role in the commission of an individual count or an overt act suggests a limited involvement ignores that the Grand Jury found probable cause to believe each defendant individually participated in a long-standing, sophisticated, and extensive narcotics trafficking organization. It is therefore no answer to say, for example, that if the defendant were before the court charged only with the individual count or counts in which he is named, he would qualify for release. No defendant is charged only with that count or a particular overt act. Each is charged with participation in an overarching conspiracy and it is that charge which must underline the detention determination. Since the conspiracy charged is a sophisticated enterprise with large sales at the wholesale level, defendants fall directly within the class of defendants Congress intended be presumptively detained.

## CONCLUSION

The evidence before the Grand Jury established these defendants' involvement in a long-standing, wholesale drug conspiracy. There is no adequate reasons to conclude that their lucrative long term drug dealing will suddenly cease; Congress has presumed the contrary and defendants have not rebutted that presumption. I, therefore, find by clear and convincing evidence that there are no conditions I could set that would reduce to a tolerable level the danger to the community they represent. I will, therefore, order them detained pending trial.

### OVERT ACTS

| DEFENDANT | DATE | DESCRIPTION |
| --- | --- | --- |
| Anthony Van Scott | 9/23/97 | PWID |
| Clarence Earl Williams | 2/10/98 | PWID; 924(c)(1) |
| Melvin Cherry | 9/9/98 | Poss. firearms at residence |
| Clarence Earl Williams | 10/23/98 | PWID |
| James McDonald | 2/12/98 | $110,000 to associate |
| d/o | 3/14/99 | PWID 1500 grams |
| Anthony Van Scott | 3/18/00 | Poss. 106 bags and $1,864 in proceeds |
| Harry Settles | 9/21/00 | Dist. |

| | | |
|---|---|---|
| James McDonald | 11/4/00 | Rec'd order for cocaine |
| Harry Settles | 12/21/00 | Dist. |
| Melvin Cherry | 2/01/01 | Co-conspirators discussed with Cherry whether some one was cooperating |
| James McDonald | 1/8/01 | Rec'd order |
| Harry Settles | 1/19/01 | PWID |
| James McDonald | 2/9/01 | Rec'd order |
| d/o | 2/22/01 | Rec'd order |
| Ralph Worthington | 3/13/01 | Used phone to arrange for distribution of crack |
| d/o | 3/16/01 | Dist. |
| James McDonald | 3/28/01 | Rec'd order |
| Ralph Worthington | 4/18/01 | Dist. |
| Melvin Cherry | 5/5/01 | Facilitated distribution |
| James McDonald | 5/7/01 | Rec'd order |
| Ralph Worthington | 5/31/01 | Dist. |
| Clarence Earl Williams | 6/6/01 | Poss. gun |
| Ralph Worthington | 6/7/01 | Dist. |
| James McDonald | 7/4/01 | Arranged for delivery of 1/2 kilogram |
| Anthony Cherry | 7/23/01 | Used phone to obtain crack |
| Kelly Brown | d/o | d/o |
| Ralph Worthington | 7/24/01 | Dist. more than 5 grams |
| Clarence Earl Williams | 7/28/01 | Used phone |
| d/o | 7/31/01 | d/o |
| d/o | 8/6/01 | d/o |
| Anthony Van Scott | 8/9/01 | Used phone; used code to obtain certain amount of crack |
| Ralph Worthington | 8/10/01 | Used phone to talk about drug debt |
| Anthony Van Scott | 8/11/01 | Used phone |
| Clarence Earl Williams | d/o | d/o |
| James McDonald | d/o | Used phone to demand payment |
| Anthony Cherry | 8/12/01 | Used phone |
| Clarence Earl Williams | 8/13/01 | Used phone |
| Michael Henderson | 8/17/01 | Used phone to say that cops had searched certain residence |
| Anthony Van Scott | d/o | Used phone |
| d/o | 8/18/01 | Used phone; told not to use the phone for narcotics transactions |
| Ralph Worthington | d/o | Used phone |
| Michael Henderson | 8/20/01 | Used phone to discuss pooling resources to buy large quantity from McDonald |
| James McDonald | 8/22/01 | Used phone to demand payment |
| d/o | 8/23/01 | d/o |
| d/o | d/o | d/o (phone belonged to Wingate) |
| Jimmy Wingate | 8/23/01 | Used a phone to facilitate McDonald's receipt of payment |
| James McDonald | d/o | Used van to facilitate payment |
| Michael Henderson | 8/24/01 | Used phone to get crack from McDonald |
| James McDonald | d/o | Rec'd page re. getting crack |
| Clarence Earl Williams | d/o | Used phone and pager to get crack |

| | | |
|---|---|---|
| Anthony Van Scott | d/o | Used phone to get crack |
| Anthony Cherry | 8/26/01 | d/o |
| Michael Henderson | 8/27/01 | Had phone conversation re. getting money to buy crack |
| Anthony Cherry | d/o | Used phone to arrange payment for crack |
| d/o | 8/28/01 | Used phone to get crack |
| d/o | 8/30/01 | Rec'd crack; PWID crack |
| d/o | d/o | Arrested for PWID crack |
| d/o | 8/31/01 | Used phone to talk about his arrest |
| Ralph Worthington | d/o | Used phone to discuss payment for crack |
| d/o | d/o | Used phone to talk about search warrant executed at customer's house |
| James McDonald | d/o | Used phone belonging to Jimmy Wingate to arrange delivery of crack |
| Anthony Cherry | 9/4/01 | Used phone to get crack |
| Kelly Brown | 9/5/01 | Used phone to get crack |
| Ralph Worthington | d/o | Met with co-conspirator re. search warrant issued for customer's house |
| un-indicted co-conspirator | 10/26/01 | Obtained cell phone in name of Beatrix Williams |
| James McDonald | 1/22/02 | Used phone belong to Jimmy Wingate to confirm receipt of crack and arrange for payment |
| Anthony Van Scott | 1/29/02 | Used phone to get crack and arrange meeting location |
| Jimmy Wingate | 1/30/02 | Used phone to get crack from James McDonald. |
| Darryl Williams | d/o | Used phone to get crack |
| James McDonald | 2/02 | Caused associate to have $237,000 plus in a van for purchase of crack |
| Darryl Williams | 2/1/02 | Used phone to get crack |
| Darryl Williams | 2/2/02 | Used phone to get crack |
| Torran Scott | 2/5/02 | Used phone to speak with unindicted co-conspirator re: whether someone was cooperating with law enforcement |
| Michael Henderson | d/o | Used phone to discuss rental payment for stash house Henderson used to cook crack |
| d/o | 2/6/02 | d/o |
| d/o | 2/7/02 | d/o |
| Darryl Williams | 2/8/02 | Used phone to obtain crack |
| Clarence Williams | 3/27/02 | Dist. more than 50 grams |
| d/o | 4/12/02 | d/o |
| Jimmy Wingate | 4/12/02 | Rec'd call from unindicted co-conspirator re contact with McDonald |
| Michael Henderson | 6/27/02 | PWID; Poss. two firearms |
| d/o | d/o | Poss. firearm |

## SUBSTANTIVE OFFENSES

| COUNT NO. | DEFENDANT | DATE | DESCRIPTION |
|---|---|---|---|
| 2 | Clarence Earl Williams | 2/10/98 | PWID |
| 3 | d/o | 2/10/98 | 924(c)(1) |

| 4 | d/o | 2/10/98 | 922(g)(1) |
|---|---|---|---|
| 5 | James McDonald | 3/14/99 | 924(c)(1) |
| 6 | Harry Settles | 9/21/00 | Dist. |
| 7 | d/o | 12/21/00 | Dist. |
| 8 | d/o | 1/19/01 | PWID |
| 9 | Ralph Worthington | 3/16/01 | Dist. |
| 10 | d/o | 4/18/01 | Dist. |
| 11 | d/o | 5/31/01 | Dist. 5 grams |
| 12 | Clarence Earl Williams | 6/6/01 | 924(c)(1) |
| 13 | d/o | 6/6/01 | 922(g)(1) |
| 14 | Ralph Worthington | 6/7/01 | Dist. |
| 15 | d/o | 7/24/01 | Dist 5 grams |
| 16 | Anthony Cherry | 8/30/01 | PWID |
| 17 | Clarence Earl Williams | 3/27/02 | Dist. 50 grams |
| 18 | Clarence Earl Williams | 4/12/02 | Dist. 50 grams |
| 19 | Michael Henderson | 6/27/02 | 924(c)(1) |
| 20 | Michael Henderson | 6/27/02 | 924(c)(1) |

Legend:

| | |
|---|---|
| Dist. | Distribution |
| d/o | Same as above |
| Poss. | Possession |
| PWID | Possession with the intent to distribute |
| Rec'd | Received |
| 924(c)(1) | 18 U.S.C.A. § 924(c)(1) |
| 922(g)(1) | 18 U.S.C.A. § 922(g)(1) |